## BENSON *v.* RAYMOND.

1. CANCELLATION OF INSTRUMENTS—DEEDS—CAPACITY OF GRANT-OR—EVIDENCE—SUFFICIENCY.

On a bill to set aside a deed on the ground of the mental incompetency of the grantor to execute it, evidence examined, and *held,* to sustain a decree granting the relief prayed.

2. SAME — DEMONSTRATIVE EVIDENCE — PRODUCTION OF ALLEGED INCOMPETENT IN COURT.

On a bill to set aside a deed on the ground of the mental incompetency of the grantor, it is proper to produce him in court at the hearing.

3. SAME—EVIDENCE—ADMISSIONS BY GRANTEE.

On a bill against heirs of the grantee in a deed to set it aside on the ground of the mental incompetency of the grantor to execute it, admissions by the grantee respecting the grantor's competency are admissible in evidence.

ON MOTION FOR REHEARING.

CANCELLATION OF INSTRUMENTS — EVIDENCE — ADMISSIONS BY GRANTEE.

On a bill against heirs of the grantee in a deed to set it aside on

the ground of mental incompetency of the grantor, declarations of the grantee tending to show such incompetency, made before she acquired title, are not admissible in evidence.

Appeal from Hillsdale; Chester, J.   Submitted November 14, 1905.   (Docket No. 126.)   Decided December 22, 1905.   Rehearing denied July 23, 1906.

Bill by C. L. Benson, administrator of the estate of Albert Hinkley, deceased, and others, against Tensey Raymond and John Bailey to set aside a deed.   From a decree for complainants, defendants appeal.   Affirmed.

*Fellows & Chandler*, for complainants.

*Clayton · A. Powell* and *B. E. Sheldon* (*Allen B. Morse* and *Henry C. Smith*, of counsel), for defendants.

BLAIR, J.   The bill of complaint in this case was filed by Albert Hinkley in his lifetime to set aside and annul a deed of 40 acres of land to his wife, Mary J. Hinkley, executed and recorded July 28, 1903, on the ground of his mental incompetency to execute the same.   Decree was entered in accordance with the prayer of the bill, to reverse which defendants prosecute this appeal.

After the hearing of the case, and on September 20, 1904, complainant died, and the suit was revived in the name of the present complainants.   At the time of their marriage, some 15 or 20 years before the hearing, complainant was a widower with three children, Elrie, Horace, and Anna, and his wife, then Mrs. Bailey, was a widow with three children, Susie, Tensey, and John.   No children were born to them after the marriage.   At the time of the marriage Mr. Hinkley was the owner of the 40 acres in question in this suit, where all of his children were born, and Mrs. Hinkley was the owner of 90 acres, about $1\frac{1}{2}$ miles distant therefrom.   About 1894 or 1895 complainant had a stroke of paralysis.   In February of 1901 he suffered a severe shock of apoplexy, resulting in paralysis of the left side.   He was unconscious from this

attack for six or eight days.    The physician who attended him testified:

" *Q.* Well, you describe his mental condition after his recovery.
"*A.* Well, it was somewhat weakened.
" *Q.* Is that necessarily a condition of the mind of a paralytic after having a severe stroke?
"*A.* It is with all of them.
" *Q.* Yes; that is the general practice?
"*A.* Yes, their head is never as good afterwards."

At the time of executing the deed complainant was nearly 70 years old.    In February of 1904 Mrs. Hinkley died, and thereafter her daughter, Susie Newell, executed a quitclaim deed to complainant of her interest in the 40 acres, but the other children, the defendants herein, refusing to do so, complainant filed this bill in June, 1904.

The sole question in the case is whether the complainant was competent mentally to execute the deed.    The circuit judge found that he was not, and we have come to the same conclusion.    We agree with counsel for contestants that much of the opinion evidence introduced by complainants' counsel was incompetent; but, eliminating this testimony from consideration, we are still of the opinion that the decree was right.    Mrs. Susie Newell was a daughter of the grantee in the deed, and her financial interest would naturally lead her to desire that the deed should be sustained.    She testified, however, in favor of complainant, and we regard her testimony as conservative, candid, and entirely worthy of credit.    Mrs. Newell was with her mother more or less during her last sickness, and testified that:

"She always claimed whenever she would talk about Mr. Hinkley to me, in the condition that he was, that he wasn't capable of caring for himself or doing any business."

That for the last two or three years her mother had really done the business.

" I gave that deed back to my stepfather because it was

right. It was my mother's wishes, and it was mine. * * *

"She told me, after Mr. Bennie Hinkley had taken him home, that she wanted any one of the Hinkley family that would take Mr. Hinkley and take care of him to have the 40 acres back again. * * *

"He would do things that was awfully funny. It seemed to me that, if he was in his right mind, he wouldn't have done them. * * * Why, he would do some funny things when I would be there, you know, and ma would make the remark, 'Why, grandpa wasn't capable of doing as he once did,' and such things as that, you know, would be brought up."

She says he would go away and not seem to know why he went, "but he went just like a child." She also speaks of his eating some chicken which had been put on a plate for his wife when she was sick in bed, as well as the portion on his own plate, and apparently not knowing that he had eaten both portions. "That is one act I can think of. Of course, I could give you others, if I could think— lots of such little things, of course." Charles Carpenter rented the 40 acres in January, 1903, and transacted the business entirely with Mrs. Hinkley, and, when he would come to settle, he would settle with her; that he was not able to have any connected conversation with Mr. Hinkley.

William Ware testified:

"I heard her say a great many times that Albert did not have any more mind than a child, that she had to dress him and show him how to dress, that in putting on his boots he was liable to undertake to put them on with the heel ahead, and that in putting on his socks he would sometimes take hold of the leg with one hand and toe with the other and try to put it on in the middle, and swear that they wasn't made right. I have heard that a number of times, the same thing over. Mrs. Hinkley told it in her own house and in our house, and I saw Albert myself undertake to put on his coat and get his hand in the sleeve and say that somebody had sewed up the sleeve, or that the coat wasn't made right. That is my own observation. * * *

"Q. Now, were these occasions frequent, when Mrs.

Hinkley told you with reference to the things he would do, and that his mind was that of a child—was that frequent?

"*A.* Oh, yes, she told me this after she got to Pittsford and before."

In the instances given by defendants' witnesses of business transacted by complainant, we are satisfied that they were not so far conducted by complainant as to establish his competency to transact business for himself. In the case of borrowing the $500 and giving the mortgage to Dr. McKellar, he testifies that they came together at first:

"*Q.* She did some of the talking, I suppose?

"*A.* Yes; some of it.

"*Q.* And womanlike, I suppose?

"*A.* The same as all the rest of them.

"*Q.* And did she explain what was going to be done with the money? They were going to buy a place in Pittsford?

"*A.* Yes, sir.

"*Q.* And you thought that would be a good thing for those old people to get off from the farm and get into Pittsford?

"*A.* Yes.

"*Q.* And so you made the loan? Was it made that day?

"*A.* No; they came and saw me in regard to the loan, and then they come up to Hillsdale here. The loan was made in Hillsdale.

"*Q.* Come up and looked over the record?

"*A.* Yes.

'*Q.* And then you took the mortgage here?

"*A.* Yes, sir.

"*Q.* She was here?

"*A.* She was; yes.

"*Q.* She did some of the talking here?

"*A.* Part of it.

"*Q.* Yes; most of it, didn't she? ·

"*A.* Well, she could talk better than he could.

"*Q.* And she did most of it?

"*A.* Hinkley was a man.

"*Q.* And she seemed to know all about the deal, didn't she—what they were going to do with the money?

"*A.* Yes, sir."

The scrivener who drew and took the acknowledgment of the deed testified that Mrs. Hinkley spoke to him about it first, and that no explanation was made of the effect of the deed.

" Q. What did he tell you that day ?  Do you remember anything that he said to you that day ?

" A. I don't remember anything that he said.  I could not say—I could not say that I had any conversation with him, any more than prompting him in regard to getting up to the table and signing the deed when he signed it."

She was present when the witness Rarick tried to buy some timber from her husband.  Rarick testified:

" Well, he said it was not enough, and he would not let it go.  She seemed inclined to have him sell it; talked with him in regard to selling it; thought they had better sell it and put the money into some fences there.  He would not let it go, and I went away.  A few days after that, I met Mrs. Hinkley on the street in Pittsford, and she said she guessed, if I went down, that I could buy that timber; that Albert had about made up his mind that he would let it go.  So I went down and asked him if he had made up his mind to let me have the timber, and he said he thought he would."

Defendants' witness Anna Solomon testified that she had a talk with complainant about his property:

"Q. Well, didn't you understand, from the way he talked to you, that he wanted it, not to go to his children, but after he was through with it to have it fixed so that she would have it—his wife ?

"A. Why, that is what I thought he meant.  That is the way I understood it."

Redirect examination:

"Q. In his conversation to you he said that he deeded this to her because she had been so good to him, or that in substance ?

"A. Yes, sir."

The complainant was in court during the hearing. The defendants' counsel criticise complainants very harshly for bringing complainant into court.  We think

the criticisms are entirely uncalled for and unjust. It was perfectly proper and in furtherance of justice to bring the complainant before the court, and afford the judge an opportunity of seeing him, and, if he desired, of questioning him. It was the theory of complainants' counsel that he was incapable of holding a connected conversation. His nephew Ben Hinkley testified that he was incapable, as he sat in court, of holding connected conversation. If defendants' counsel desired to dispute this testimony, they had an opportunity to apply a decisive test by calling the old gentleman as a witness. They did not do so, and we think their brief shows that the reason was that they were satisfied that at that time he was incapable of testifying.

The person who knew the most about complainant's mental competency was his wife, and she repeatedly told her daughter, Mrs. Newell, down to the day of her death, that he was not competent to transact business. It is clear from Mrs. Newell's testimony that her mother never intended to deprive her husband of this land if he survived her, and it is clear from Mrs. Solomon's testimony that complainant did not intend to part with his interest in the land completely during his lifetime. His actually doing so is a circumstance of some weight in determining whether he was capable of understanding the obvious effect of his deed in case his wife died first. It is contended, however, that the declarations and admissions of Mrs. Hinkley were "incompetent, immaterial, and irrelevant." It is well established that such declarations and admissions are competent, and considering them in connection with the other evidence in the case, as well as the admitted appearance of the complainant in court, we think the court arrived at the proper result. 16 Cyc. pp. 985, 986, 990; 2 Wigmore on Evidence, § 1081; *Brown* v. *Stutson*, 100 Mich. 574.

The decree is affirmed, with costs of both courts to complainants.

GRANT, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.

### ON MOTION FOR REHEARING.

PER CURIAM. Appellants apply for a rehearing. It is argued in support of the motion that most of the testimony of admissions by Mrs. Hinkley upon which the court relied was incompetent because the admissions were not shown to have been made while Mrs. Hinkley held the title; that the court gave weight to the fact that the alleged incompetent person was present in court and observed by the judge, whereas he was in fact at the time dying of pneumonia and actually died the next day; that, eliminating the incompetent hearsay statements of Mrs. Hinkley, the misconceived and misconstrued testimony of Charles Carpenter, and the appearance of Albert Hinkley before the court, the weight of the evidence is conclusively in favor of defendants.

In consequence of this application, we have again reviewed the record in the light of the briefs furnished upon this application, and are satisfied that the court misconstrued the testimony of Carpenter; that some of the declarations or admissions cited in support of the opinion were incompetent under the rule referred to by counsel and recognized by the court in the opinion, as shown by the authorities cited, and that the fact that the circuit judge observed Mr. Hinkley in court was probably not entitled to any weight. We are still, however, of the opinion that the court reached the right result.

The conclusion arrived at was based principally upon the testimony of Mrs. Newell, which was competent as to the admissions of her mother and as to the mental competency of Mr. Hinkley. There was no attempt to set out all of the testimony upon which the court relied. Of the witnesses who were referred to, Carpenter testified as stated in the opinion; but we think, on fuller consideration, that his statement that he was not able to have any connected conversation with Mr. Hinkley was a conclu-

sion not based upon an attempt to hold such conversation. Ware's testimony as to admissions by Mrs. Hinkley was thought to be admissible because he stated she made them after she got to Pittsford; but, as it does not appear distinctly that they were made after she acquired the title, they were inadmissible. His testimony as to what he saw himself was admissible. The testimony of the scrivener and other witnesses referred to tended to show, as to the business transactions, that Mrs. Hinkley was really the moving party, and supported Mrs. Newell's testimony.

We still adhere to our construction of Mrs. Solomon's testimony, and there was other testimony, which was not referred to in the opinion, which was considered competent and as supporting Mrs. Newell's. There was nothing in the record to indicate that Mr. Hinkley was dying of pneumonia, and although the attention of defendants' attorneys was directly challenged to his appearance in the court-room, they put in no evidence that his condition was due to pneumonia, or any other cause than the progress of paralysis, but contented themselves with testimony tending to show a decided change in his condition.

Our criticism of the brief of defendants' attorney, upon the basis of the record, was mild.

The application is denied.